JUDGMENT

PER CURIAM.
These petitions for review were considered on the record from the Federal Energy Regulatory Commission (FERC) and on the briefs filed by the parties. See Fed. R.App. P. 34(a)(2); D.C.CiR. R. 34(j). The issues have been accorded full consideration by the Court and occasion no need for a published opinion. See D.C.Cir. R. 36(b). It is
ORDERED and ADJUDGED that the petition of Marathon LNG Marketing LLC be dismissed for lack of standing, and that the petition of Latha Anderson, et al. (“Landowners”) be denied.
Southern LNG, Inc. operates a terminal for receiving imports of liquefied natural gas (LNG) on Elba Island, near Savannah, Georgia. Southern applied to expand its service at the Elba Island terminal and sought Commission approval for a new rate schedule, LNG-3, establishing terms and conditions for the expanded service. The Commission approved both the expansion and the new rate schedule.
Marathon contracts with BG LNG Services LLC, a Southern customer on the existing LNG-1 rate schedule, to reimburse it for LNG-1 rates. Marathon challenges the Commission’s approval of new rate schedule LNG-3, arguing that it was without authority to approve the rates, and that LNG-3 rates are too low, unlawfully causing subsidization of LNG-3 customers by LNG-1 customers.
In order to establish standing, a petitioner must demonstrate that it “suffered an injury-in-fact, that the injury is fairly traceable (causally connected) to the challenged agency action, and that it is likely as opposed to merely speculative that the injury will be redressed by a favorable decision of the court.” Klamath Water Users Ass’n v. FERC, 534 F.3d 735, 738 (D.C.Cir.2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 556-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Marathon has no economic stake in the outcome of its challenges and therefore cannot satisfy these requirements. The LNG-1 schedule has not changed, so Marathon has not been subjected to a higher rate. Marathon appears to take the view that some of its costs should be reapportioned to LNG-3 customers, and that, notwithstanding its stable rates, failure to reapportion amounts to subsidization. If Marathon is indeed entitled to pay a lower rate so as not to subsidize LNG-3, the Commission’s failure to lower LNG-1 *577 would be a cognizable economic injury. It is not, however, one that can be redressed at this time by a favorable decision of this court, because Marathon expressly refrained from asking the Commission to lower its LNG-1 rates in the underlying proceedings. Mot. Intervene at 12, Southern LNG, Inc., 120 F.E.R.C. ¶ 61,258 (2007) (No. CP06-170-000) (“[T]he base rates currently charged for service under LNG-1 are the subject of a rate moratorium.... Accordingly, Marathon LNG is not here requesting any change in the existing LNG-1 base rates.”). Marathon may in the future have standing to challenge LNG-3 rates if they cause its own rates to be raised, or if the Commission rejects a properly presented claim to lower LNG-1 rates. But Marathon has not suffered any economic harm that can be redressed in the instant case.
Also before the Commission, Elba Express Company, LLC (a Southern LNG affiliate) applied to construct a new, 188-mile pipeline to transport natural gas from Port Wentworth, Georgia, to an interconnection with Transco’s pipeline system. The northernmost 88 miles of this pipeline would require construction in a new right-of-way. The affected Landowners challenge the Commission’s approval of the construction of the pipeline along the proposed route.
The Landowners’ primary ai’gument is that the Commission arbitrarily and capriciously rejected less harmful pipeline routes based on the erroneous assumption that the new pipeline must interconnect with Transco’s pipeline in both Zones 4 and 5. It bases this claim on evidence in the record that “[t]here is no unsubscribed firm capacity on Transco’s pipeline system [in Zone 4].” Landowners’ Br. 7. The Commission rejected the challenge, discounting this “single snapshot of Transco’s pipeline capacity,” noting that Elba Express “will be able to offer incremental supplies,” and predicting that the “markets will respond according to their needs, and Transco’s pipeline capacity will be made available pursuant to such market demand.” Southern LNG, Inc., 120 F.E.R.C. at ¶ 142. FERC’s conclusion that a Zone 4 interconnection is necessary is reasonable. As the Commission explains, the requirement of a Zone 4 interconnection was specified not by Elba Express but by the “project shippers and their customers,” Fed. Energy Regulatory Comm’n, Final Environmental Impact Statement: Elba III Project, at 3-20 n. 5 (August 2007) (“Final EIS”), indicating an expected ability to deliver gas to Zone 4. This expectation is not inconsistent with evidence that firm capacity is currently fully subscribed. We have explained that “ ‘firm capacity — transportation for which the pipeline guarantees delivery, [is] distinct from ‘interruptible capacity,’ for which delivery can be delayed if and when the pipeline has insufficient capacity to meet all customers’ demands.” Process Gas Consumers Group v. FERC, 292 F.3d 831, 833 (D.C.Cir.2002). Furthermore, as we have also discussed, firm capacity that is “subscribed” is not necessarily used, and there exist secondary markets for firm capacity. See American Gas Ass’n v. FERC, 428 F.3d 255, 261 (D.C.Cir.2005) (“Through shipper ability to release excess firm capacity, FERC also created a secondary market for firm capacity in competition with pipeline interruptible service.”). The Landowners have therefore raised no reason to doubt the rationality of the Commission’s conclusion that, as the market demands, the pipeline will be able to deliver gas to both Zones 4 and 5, and that the interconnection with both will benefit consumers in both zones. Accordingly, we conclude that the Commission’s approval of the pipeline along the proposed route was not arbitrary or capricious.
*578 The Landowners also contend that the Commission failed to adequately consider alternative pipeline routes, as well as the “No Action” alternative, as required by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. The Landowners’ primary objection to the Commission’s consideration of Alternatives B and C is based on its Zone 4 argument, which, as explained above, we reject. Their only additional argument is that the calculation of necessary acreage for Alternative B was inflated, but they failed to raise this objection before the agency and therefore may not raise it now. 15 U.S.C. § 717r(b). Finally, the Landowners’ argument that the Commission failed to adequately consider the “No Action” alternative is based on the Commission’s alleged failure to cite studies establishing a need for increased energy supplies. That premise, however, is incorrect. See Final EIS, swpra, at 1-3 to 1-4 (citing 2004-2006 studies of the U.S. Department of Energy, Energy Information Administration). We conclude that the Commission did not violate NEPA.
The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing en banc. See Fed. R.App. P. 41(b); D.C.Cir. R. 41.